J-S39001-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: RELINQUISHMENT OF: A.P. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.P., FATHER | No. 2250 MDA 2015 |

Appeal from the Order entered November 18, 2015,
in the Court of Common Pleas of Lackawanna County, Orphans'
Court, at No: A-44 of 2015

| | |
|---|---|
| IN RE: RELINQUISHMENT OF: J.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.P., FATHER | No. 2251 MDA 2015 |

Appeal from the Order entered November 18, 2015,
in the Court of Common Pleas of Lackawanna County, Orphans'
Court, at No: 2015-00045

BEFORE:  STABILE, PLATT, and STRASSBURGER*, JJ.

MEMORANDUM BY STABILE, J.:                      **FILED JULY 06, 2016**

Appellant, J.P. (Father), appeals from the November 18, 2015 orders involuntarily terminating his parental rights to his twin sons, A.P. and J.P., born in January of 2004.  Upon careful review, we affirm.

A.P. and J.P. were adjudicated dependent on December 7, 2012, at which time Father was incarcerated.  Trial Court Opinion, 2/16/16, at 1; N.T., 10/21/15, at 79.  Initially, A.P. and J.P. were placed with Father's wife, M.P.-P.  On May 30, 2013, while Father remained incarcerated, they were

---

* Retired Senior Judge assigned to the Superior Court.

removed and placed together in the same foster home. Trial Court Opinion, 2/16/16, at 1-2; N.T., 10/21/15, at 79-80. The Lackawanna County Office of Youth and Family Services (the Agency) established Family Service Plan (FSP) goals for Father including that he comply with prison programs, participate in parenting classes and drug and alcohol classes in prison, and that he be successfully released from prison.[1] N.T., 10/21/15, at 16.

On May 5, 2014, the trial court ordered that Father have no contact with A.P. and J.P., due to their disclosure that Father had sexually assaulted them. Trial Court Opinion, 2/16/16 at 2; N.T., 10/21/15, at 24. The trial court aptly summarized the testimonial evidence as follows.

> After placement, A.P.['s] and J.P.'s foster parents began to notice inappropriate sexualized contact between the boys. A.P. and J.P. would touch each other's penises and make inappropriate sexual comments towards each other. A.P. touched a dog's penis and both minor children would act out sexually on each other. . . . Subsequently, both boys were interviewed at the Children's Advocacy Center [(CAC)] on July 25, 2014, regarding possible sexual abuse. Based on the CAC interview and a follow-up Child Protective Services investigation, Father was indicated as a perpetrator of sexual abuse against both minor children.[2] Father never appealed his indicated status.
>
> As a result of the alleged sexual abuse by Father, and their acting out sexually, A.P. and J.P. have been placed in separate

---

[1] Father was released from prison on November 11, 2014. He was re-incarcerated in September of 2015, for reasons unspecified in the record. N.T., 10/21/15, at 82. Likewise, there is no evidence in the record regarding the length of Father's maximum and minimum sentences.

[2] In addition, Father was indicated as a perpetrator of sexual abuse against N.L., who is the biological son of T.L. (Mother), and the half-brother of A.P. and J.P.

therapeutic foster homes and therapy. Both receive regular therapy and Sexual Issues Treatment Education therapy, (SITE), which is for children of sexual abuse. Casey Murray, the minor children's SITE counselor[,] testified that . . . the sexual abuse by Father has affected every aspect of the minor children's lives. A.P. and J.P. both report being afraid of the dark because Father's abuse would take place at night. A.P. and J.P. have to take a separate bus to school because of sexual comments they were making to a kindergarten student.[3] Further, she testified A.P. and J.P. have trouble becoming close to males, both having much closer relationships with their foster mothers, than with their foster fathers.

Trial Court Opinion, 2/16/16, at 2-3 (citations to record omitted).

In February of 2015, when Father was no longer in prison, the Agency discussed new FSP goals with him, including participating in a sexual offender program. N.T., 10/21/15, at 19-20. The trial court explained as follows.

Father [ ] refused because the program requires participants to admit responsibility for their actions. . . . As part of the new plan, the [A]gency also wanted Father to participate in [a] Father's Group and have a sex offender evaluation performed. Father refused to sign the plan and refused to participate in the services offered to him by the [A]gency at that time. The order of no contact between the minor children and Father remains in effect to the present day.

Trial Court Opinion, 2/16/16, at 3-4 (citations to record omitted).

On June 9, 2015, the Agency filed petitions for the involuntary termination of parental rights of Father and Mother pursuant to 23 Pa.C.S.A.

---

[3] Specifically, Ms. Murray testified, "There was a time when they were in Bushkill Elementary, [J.P.] and [A.P.] had to be transported on a separate bus, . . ., because of sexual comments they made to a female student in kindergarten." N.T., 10/21/15, at 175.

§ 2511(a)(1), (2), (5), (8), and (b). A hearing occurred on October 25 and 29, 2015, during which the Agency presented the testimony of the following witnesses: Agency caseworkers, Cristin Wormuth, Jay D. Miller, Marissa Lynady, and Marcy McNamara; Megan Ryman, specialist at Drug and Alcohol Treatment Services; Casey Murray, therapist at SITE, mentioned above; Megan Carey, clinical coordinator at Pennsylvania Mentor, who provides therapy to A.P.; and George Hockenbury, an employee at Northern Tier Research and an expert in toxicology and pathology. Mother testified on her own behalf. Father did not testify or present any witnesses.

By orders dated November 6, 2015, and entered on November 18, 2015, the orphans' court involuntarily terminated Father's and Mother's parental rights.[4] Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*.[5] The orphans' court filed its Rule 1925(a) opinion on February 16, 2016.

On appeal, Father presents the following issues:

A. Whether the [orphans'] court erred as a matter of law and/or manifestly abused its discretion in determining the Agency sustained its burden of proving the termination of Father's parental rights is warranted under Sections 2511(a)(1), 2511(a)(2), 2511(a)(5) and/or 2511(a)(8) of the Adoption Act?

---

[4] With respect to Mother, the trial court involuntarily terminated her parental rights to A.P., J.P., and N.L. Because N.L. is not Father's child, he is not a subject of this appeal.

[5] Mother did not file notices of appeal.

B. Even if this Court concludes the Agency established statutory grounds for the termination of Father's parental rights, whether the [orphans'] court nevertheless erred as a matter of law and/or manifestly abused its discretion in determining the Agency sustained its additional burden of proving the termination of Father's parental rights is in the best interests of [A.P. and J.P.]?

Father's Brief at 5.

We consider Father's issues, mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in

- 5 -

the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

This Court need only agree with any one subsection of Section 2511(a), along with Section 2511(b), in order to affirm the termination of parental rights.[6] *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We conclude that the trial court in this case properly terminated Father's parental rights pursuant to Section 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .

---

[6] Instantly, we conclude that termination pursuant to Section 2511(a)(5) and (8) was not proper because Father was incarcerated at the time of A.P.'s and J.P.'s placement. *See In re C.S.*, 761 A.2d 1197 (Pa. Super. 2000) (*en banc*) (stating that Section 2511(a)(5) and (8) did not provide a basis for terminating the father's parental rights when he was incarcerated at the time of the child's removal from the mother's care); *see also In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010) (same).

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

To satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct. To the contrary, those

grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002).

In *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), our Supreme Court addressed the relevance of incarceration in termination decisions under Section 2511(a)(2). The *S.P.* Court held that

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*Id.* at 828.

With respect to Section 2511(b), this Court has explained the requisite analysis as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Father acknowledges in his brief that his "re-incarceration is a compelling factor" under Section 2511(a)(2) pursuant to *S.P.*, *supra*, and

- 8 -

*In re D.C.D.*, 105 A.3d 662, 675 (Pa. 2014) (holding that the father's incarceration prior to the child's birth and until the child is at least age seven renders family reunification an unrealistic goal. As such, the court was within its discretion to terminate parental rights "notwithstanding the agency's failure" to follow the court's initial directive that reunification efforts be made.). Father's Brief at 14. In addition, Father acknowledges that the no-contact order issued on May 5, 2014 "provides an additional barrier to reunification." *Id.* Nevertheless, Father baldly asserts that the orphans' court erred in terminating his parental rights pursuant to Section 2511(a)(2). For the following reasons, we conclude that Father's assertion is without merit.

> The trial court found as follows:
>
> Father's incarceration at the time of placement, his re-incarceration, the no[-]contact with the minor children since May 5, 2014, and his refusal to participate in services clearly has incapacitated "his ability to care for the children[,] leaving them without "essential parental care, control, or sustenance" . . . .

Trial Court Opinion, 2/16/16, at 7. The testimonial evidence supports the court's findings.

Mr. Wormuth, the Agency caseworker for this family from October of 2013, to March of 2015, testified that Father was indicated a perpetrator of sexual abuse on August 12, 2014. N.T., 10/21/15, at 85. Mr. Wormuth testified he informed Father in February of 2015, after his release from prison, that his FSP was updated to include participation in a sexual offender

program, in a father's group, and for him to obtain "an evaluation," but Father "did not want to work with any of the services that I talked with him about that day." *Id.* at 20.

Ms. Lynady, the Agency caseworker after Mr. Wormuth and up through the time of the subject proceedings, testified that she had only one contact with Father, which was at a hearing involving this family on April 27, 2015. N.T., 10/29/15, at 41. She testified an FSP was adopted at that hearing that included the goal of Father obtaining a sexual offender evaluation, but Father refused to sign the FSP. *Id.* at 42.

Therefore, from November of 2014, to September of 2015, the months that Father was not in prison, he refused to comply with his updated FSP goals. We discern no abuse of discretion by the orphans' court in concluding that Father's repeated and continued refusal in this regard caused A.P. and J.P. to be without essential parental care, control, or subsistence, and the causes of the refusal cannot or will not be remedied.

In addition, with respect to the no-contact order, we conclude that the rationale of our Supreme Court in *S.P.*, *supra*, is applicable. We discern no abuse of discretion by the orphans' court to the extent it found that the no-contact order results in the repeated and continued incapacity of Father, which has caused A.P. and J.P. to be without essential parental care, control, or subsistence, and the causes of the incapacity cannot or will not be remedied.

Likewise, pursuant to **S.P.**, **supra**, we discern no abuse of discretion to the extent the court found that Father's re-incarceration in September of 2015, results in the repeated and continued incapacity of Father, which has caused A.P. and J.P. to be without essential parental care, control, or subsistence, and the causes of the incapacity cannot or will not be remedied. Thus, Father's first issue fails.

In his second issue, Father argues the orphans' court abused its discretion in terminating his parental rights pursuant to Section 2511(b). Specifically, Father asserts, (1) "there are no present resources to provide permanency" for A.P. and J.P.; (2) there is no record evidence regarding the effect that termination will have on A.P. and J.P.; and (3) the court failed to consider the effect that termination will have on the needs and welfare of A.P. and J.P. Father's Brief at 16. We disagree.

With respect to Father's first assertion, this Court has recognized that, "the Juvenile Act does not require pre-adoptive placement as a precondition to termination of parental rights." **In re T.D.**, 949 A.2d 910, 922-923 (Pa. Super. 2008) (finding that the child's "age, loyalty to his natural parents, and apparent lack of an identifiable pre-adoptive placement will not automatically preclude him from attaining permanency after parental rights have been terminated"). Similarly, in **T.S.M.**, **supra**, our Supreme Court recognized that, "the Adoption Act specifically provides that a pending adoption is not a prerequisite to termination of parental rights involving

agencies. . . ." **_T.S.M._**, 71 A.3d at 268 (*citing* 23 Pa.C.S.A. § 2512(b), "If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists").

The **_T.S.M._** Court observed that, "contradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family." **_Id._** However, the Court emphasized, "the law regarding termination of parental rights should not to be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved." **_Id._** at 268-269 (citation omitted). In this case, we discern no abuse of discretion by the orphans' court in concluding that the termination of Father's parental rights would best serve the developmental, physical, and emotional needs and welfare of A.P. and J.P.

It follows that we reject Father's second assertion, that there is no record evidence regarding the effect that termination will have on A.P. and J.P., and his third assertion, that the orphans' court did not consider the effect of termination on them. We have stated that, when evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section

2511(b) does not require a formal bonding evaluation." ***In re Z.P.***, 994

A.2d 1108, 1115-1116 (Pa. Super. 2010) (internal citations omitted).

Here, the court made the following findings on which it based its

decision to terminate Father's parental rights under Section 2511(b), which

the testimony of the Agency caseworkers and the therapists supports.

> [T]here is no evidence that a bond exists between Father and the minor children. It was established through testimony presented by the [A]gency[] the minor children fear Father and do not want to be reunified with him. It was further established that the minor children are emotionally and mentally fragile and are currently in treatment. Furthermore, the children have not had any contact with their father since before the May [5], 2014 [no-contact] order. In the [c]ourt's view, reunification between the minor children and Father would be detrimental to the minor children's physical, emotional, and mental well-being.
>
> Finally, it would be in the best interest of the minor children to remain in their current setting. Both A.P. and J.P. are currently in therapeutic foster homes. . . .[7] The minor children are also receiving therapy in both the individual and group capacity. Based on the testimony presented by the [A]gency, both children have made strides in recovering from their emotional and mental issues.
>
> Further, [A.P. and J.P.] have been in placement for thirty-three (33) consecutive months and have had no contact with Father in twenty-one (21) months. This [c]ourt finds that it would be in the best interest of the minor children to remain in their current setting and for the parental rights of [Father] be terminated.

Trial Court Opinion, 2/16/16, at 8-9 (citations to record omitted).

The record reveals that A.P. and J.P., who were twelve years old at the

time of the termination hearing, are in separate foster homes, due to having

---

[7] The testimony reveals that only A.P. is in a therapeutic foster home. N.T., 10/21/15, at 87.

sexually acted out on each other in their first foster placement. N.T., 10/21/15 at 13, 17. There is no evidence that either foster home is a pre-adoptive placement. Ms. Murray, the therapist at SITE who is treating A.P. and J.P., testified that, due to the sexual abuse they suffered from Father, the children are closer to their foster mothers than their foster fathers. *Id.* at 176.

Jay D. Miller, who supervised Mother's visitations with A.P. and J.P. for the Agency, testified that A.P. and J.P. "seem[ed] very concerned [when they learned] that [Father] was out of prison." N.T., 10/21/15, at 109. He testified that A.P. and J.P. wanted to know if "anything was going to change because [Father] was out [of prison]." *Id.* at 108. Ms. Lynady, the current Agency caseworker, testified on cross-examination by the Guardian ad litem:

Q. [D]o they fear dad?

A. Whenever dad is mentioned, [A.P. and J.P.] do get anxiety and they asked a lot of questions. And once you tell them, you know, they won't see him, they seem to relax, so it does seem like [] fear and anxiety.

N.T., 10/29/15, at 47. She explained that, on the first day of the termination hearing, A.P. and J.P. were present and waiting in the victims' room. Ms. Lynady testified, "[t]hey came out towards the TV and their first question was, 'we're not going to see Dad.' And I informed them, 'no, they won't be seeing dad,' and they said, 'okay. Because we don't want to see dad.'" *Id.* at 46-47.

The testimony reveals that A.P. has suffered most severely. Mr. Wormuth, the first Agency caseworker for the family, testified that when he had the case, A.P. "was hearing voices in his head. He was still continuing to act out in school. He would hit his head off things when he got upset. He would get very agitated. [ ] I had seen him when he was in First Hospital, and he was talking about how he didn't want to live anymore." N.T., 10/21/15, at 87.

Megan Carey, the clinical coordinator at Pennsylvania Mentor, testified that she provides therapy for A.P. for anger management. N.T., 10/29/15, at 209. She testified that he

> is part of our intensive [Community Residential Rehabilitation] Program, meaning that he receives two therapy sessions per week instead of one. So he receives about two hours of therapy per week. . . . He is also part of . . . a group therapy that we do for some boys in our program that are between the ages of ten and thirteen years [] old that meets every other Monday. . . .

*Id.* at 208-209. She testified that A.P. is diagnosed with Disruptive Mood Dysregulation Disorder, Attention Deficit Hyperactivity Disorder, Post-Traumatic Stress Disorder, Physical and Sexual Abuse of a Child and Oppositional Defiant Disorder. *Id.* at 209.

Ms. Carey testified that A.P. has described feelings of fear toward Father. *Id.* at 216. However, she testified he has "very mixed feelings about his father." *Id.* at 215. Ms. Carey explained,

> There's a part of [A.P.] that, I think, until very recently, . . . continued to feel a loyalty I guess you would call it, toward his father. In addition to that, he has also felt extremely angry

towards his father, and has said that he feels that way because of the things that his father has done to hurt him. He does know that his father was recently arrested again. That seems to be a turning point for [A.P.], where I don't hear . . . I don't want to talk about my dad, because I have to protect him. . . .

. . .

[I]n the past two weeks, I'm not hearing anymore about protecting his father or the loyalty towards his father so much, it's more feeling angry towards his dad, and, 'My dad just can't seem to knock it off.' And, 'I'm glad he's in jail. That's where he belongs.' Feeling more safe that his dad is in jail, because he knows where dad is.

*Id.* at 215-216. Importantly, Ms. Carey testified, A.P. "does have a very close relationship with his foster mom." *Id.* at 241.

With respect to J.P., Mr. Wormuth testified that he was in the same foster home as N.L., his half-brother, but he was recently moved to a separate home because he and N.L. "displayed sexually acting out behaviors with each other[.]" N.T., 10/21/15, at 88. Ms. Carey testified that, as part of her treatment of A.P., she supervised an unspecified number of visits with J.P. *Id.* at 212. She testified with respect to her observations as follows:

During the visits that they have had in the past thirteen months, that I've been a part of . . ., [J.P.] has had very poor boundaries with [A.P.], stroking his face and his arms; kissing and hugging him repeatedly. I've seen him put his crotch in [A.P.]'s hand, purposely. Saying sexualized things. . . . So [A.P.] and I have talked a lot about how [A.P.] feels about that. [A.P.] has done a pretty good job of being assertive and telling his brother, 'Stop it. Get away. I don't like that.'

*Id.* The current Agency caseworker, Ms. Lynady, testified that J.P. is currently "doing well" in his new foster home. N.T., 10/29/15, at 21.

- 16 -

Finally, the SITE therapist, Ms. Murray, testified with respect to the children's mutual feelings toward Father as follows:[8]

> Q. Have they ever expressed, throughout the course of the therapy that they did with you, their feelings towards spending time with or seeing their father? . . .
>
> A. It's gone back and forth while I worked with them . . . Which I see with every client [where this abuse has] been done by the parent, because, they still have some kind of bond with the parent. [ ] I can tell you today, when we told them that he was . . . going to be here today, . . . , they were hoping that they would not have to be here and see him. [ ] [T]hey had said, 'He couldn't be at court because' . . . one of them said, [ ] 'he's in jail,' and another one said, 'No, he's not.' Two other ones said, 'He's always in jail. We don't have to worry.'
>
> Q. So they expressed fear?
>
> A. They expressed fear and that they did not want . . . to see him today. [ ] [T]here [have] been times where different ones at different times have said they miss their dad, but it's more like we miss playing video games with dad. . . .

*Id.* at 176-177.[9]

Based on the foregoing testimonial evidence, we discern no abuse of discretion by the court in concluding that A.P. and J.P. do not have a parent-child bond, or a beneficial bond of any nature, with Father. In addition, we discern no abuse of discretion by the court in concluding that reunifying

---

[8] Ms. Murray's testimony includes A.P., J.P., and N.L., since she treated all three children when they were in the same foster home. She implies in her testimony that, for the last two years, she has been treating only J.P. and N.L. N.T., 10/21/15, at 167.

[9] Although Father was represented by counsel during the termination hearing, there is no record evidence that Father was personally present. Likewise, there is no record evidence that A.P. and J.P. participated in the hearing.

them with Father would be detrimental to their developmental, physical, and emotional needs and welfare, and that A.P.'s and J.P.'s best interest is served by remaining in their separate foster placements. As such, Father's second issue with respect to Section 2511(b) fails. Accordingly, we affirm the orders.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/6/2016